## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

09/12/2017, 10:59 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANT

Steven E. Ripstra
Jacob P. Wahl
Ripstra Law Office
Jasper, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Termination of the Parent-Child Relationship of:

A.P. and T.P. (Minor Children),

and,

J.P. (Mother),

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

September 12, 2017

Court of Appeals Case No.
26A01-1702-JT-424

Appeal from the Gibson Circuit Court

The Honorable Jeffrey Fowler Meade, Judge

Trial Court Cause No.
26C01-1608-JT-208
26C01-1608-JT-209



*Appellee-Petitioner.*

**Barnes, Judge.**

# Case Summary

J.P. ("Mother") appeals the termination of her parental rights to her children, A.P. and T.P. We affirm.

# Issue

The sole restated issue before us is whether there is sufficient evidence to support the termination of Mother's parental rights.

# Facts

T.P. was born in 2002, and A.P. was born in 2003. Mother, unfortunately, suffers from mental illness. In January 2015, she began being receiving treatment from psychiatrist Dr. Greg Unfried. Mother previously had received treatment through the facility where Dr. Unfried worked. At Mother's first visit with Dr. Unfried, she was "[n]ot [doing] very well." Tr. Vol. I p. 14. Dr. Unfried had difficulty obtaining useful information from her because she would not directly answer his questions. Based on Mother's prior visits to the facility,

she was diagnosed with major depression, generalized anxiety disorder, and attention deficit hyperactivity disorder ("ADHD"). Later, Dr. Unfried amended the diagnosis to include borderline personality disorder and post-traumatic stress disorder ("PTSD"). A person with borderline personality disorder has difficulty maintaining stable relationships. Dr. Unfried continued Mother on prescriptions for Abilify, Adderall, and Viibryd. Mother also was prescribed Klonopin from a pain doctor. Abilify is an antipsychotic mood stabilizer; Viibryd is an antidepressant; Klonopin is an anti-anxiety tranquilizer; and Adderall is a stimulant used to treat ADHD. Klonopin and Adderall are both addictive and have a potential for abuse.

[4] The next time Dr. Unfried saw Mother was in February 2015. At that time she was being hospitalized for mental health issues. She informed Dr. Unfried that she was suffering from oleander poisoning. After Mother was hospitalized, the Vanderburgh County Office of the Department of Child Services ("DCS") received a report regarding the hospitalization. After receiving the report, DCS caseworker Robyn Parkhill went to Mother's home and found the children being cared for by Mother's boyfriend, Richard Springs. The home was very cluttered, with boxes and clothes strewn about and a pathway made between the living and dining rooms. Springs took the children to the home of Mother's parents after Parkhill's visit. Parkhill also went to speak with Mother at the hospital, but she was unable to do so for three or four days because of Mother's mental state. Parkhill later learned that Mother had ceased taking her prescribed medication. Additionally, Parkhill learned that Mother frequently

visited emergency rooms, seeking narcotic pain medication and then leaving against medical advice if she did not receive it.

[5] DCS filed a petition alleging T.P. and A.P. were CHINS. Mother was released from the hospital in early March 2015, after a ten-day stay. On May 26, 2015, the trial court held a fact-finding hearing on the CHINS petition. Mother apparently left the courtroom during the hearing and before presenting evidence on her behalf. The trial court then entered a default judgment against Mother on the CHINS petition. At that time, the trial court also ordered that the children be removed from the maternal grandparents' care and placed in foster care after the grandparents advised the court they could no longer care for the children. Springs, as the children's previous custodian, also was ordered to participate in CHINS services.

[6] In the summer of 2015, Dr. Unfried decided to try prescribing Mother a higher dosage of Adderall and Klonopin. For a couple of months this treatment seemed to work, and Mother appeared calmer. However, in September 2015, Mother again was hospitalized for mental health treatment. Dr. Unfried then ceased Mother's Adderall and Klonopin prescriptions, which displeased Mother, and Mother's behavior regressed to what Dr. Unfried had originally observed when he first began treating her. Dr. Unfried was concerned about Mother's ability to control her behavior and care for children, given that she was unable to control her behavior within the structured environment of his office. Mother "fired" Dr. Unfried as her psychiatrist in October 2015 because she believed he was "nasty" and lying to her. *Id.* at 35. Dr. Unfried thought it

was unlikely there was any additional treatment that could dramatically benefit Mother that he had not already tried. Mother then began seeing Dr. Williard Whitehead, another doctor in the practice where Dr. Unfried worked.

[7] After their removal from Mother's care, it was determined the children needed counseling services. A.P. initially presented with an adjustment disorder with anxiety features, but was later believed to have PTSD. T.P. was more guarded with the counselor and had difficulty expressing emotions, which also is common in traumatized children. The children's counselor believed the PTSD resulted from neglect by Mother, not because of their removal from Mother. A.P., in particular, described Mother's behavior as being very erratic and out of control, including Mother's waking A.P. up in the middle of the night when Mother wanted to find drugs to use. A.P. also discussed fights between Mother and Springs that included Mother physically assaulting Springs; during these incidents, A.P. would either hide in her closet or go to a neighbor's house. A.P. also described marijuana use and prescription pill abuse by Mother. Mother denied such drug usage, but Springs admitted to past methamphetamine and marijuana use and tested positive for methamphetamine in January 2016, which violated his probation for a burglary conviction. Also during the pendency of the CHINS case, Mother was arrested for operating a vehicle while intoxicated ("OWI"), and she pled guilty to that charge.

[8] The trial court appointed a court-appointed special advocate ("CASA"). The CASA went to Mother's home at least ten times, beginning in September 2015. She observed the same extremely-cluttered conditions that Parkhill had seen six

months previously. On her second visit to the home, she advised Mother that it was "a fire waiting to happen." *Id.* at 144-45. The CASA also frequently saw insects crawling up the wall behind the couch. The CASA did not believe the home was a safe environment for children, but Mother refused to acknowledge that there was anything wrong with the condition of the house and its condition never improved during the course of the CHINS proceedings. Additionally, although Mother was required to participate in parent aide services, she never acknowledged that she had any problem parenting the children and never showed any progress in such services.

[9] Regarding visitation, supervised visits initially were approved at the end of March 2015, but Mother did not start having visits until August 2015. After Mother began visitation, she canceled four or five visits and then started attending regularly. The last visitation occurred in May 2016. The children's biological father and older sister also came to the visit, but they were not allowed to come into the room. During the visit, Mother gave the children a card that she refused to show to the visitation supervisor. After reading it, A.P. began crying and saying "I do not want to go with them to Florida." Ex. Vol. IA p. 37. T.P. said, "I don't know them and I'm not comfortable with them." The card read in part, "I hope that understand [sic] why I'm doing this for you and me. I don't have any choice, but to send you with your sister . . . for a few months. It was either that or never hear or see from you again." *Id.* at 35. The visitation supervisor attempted to end the visit, but Mother grabbed T.P. in her arms and refused to let him go. Eventually, the visit ended after Mother yelled

"f*** you" in the visitation supervisor's face. *Id.* at 37. The children were upset after this visit, and visitation thereafter was terminated.

[10] The DCS filed a petition to terminate Mother's parental rights on August 9, 2016. The trial court held hearings on August 22, October 18, and December 13, 2016.[1] At the time of the hearing(s), the children both had demonstrated significant progress in therapy, with T.P. opening up more and A.P.'s anxiety and sleep problems decreasing. The CASA also believed there was a "daylight and dark" in how the children had progressed while in foster care, with both children being much more social than before. Tr. Vol. I p. 150. The CASA also saw academic improvements in both children. T.P., in particular, had been a year behind in his grade level but had subsequently been allowed to skip sixth grade and move directly into seventh grade. Both children were happy in their foster care home, and the foster parents wished to adopt both of them.

[11] Dr. Whitehead testified at the December 2016 regarding his opinion of the current state of Mother's mental health. He believed Mother currently had ADHD and an adjustment disorder; he also believed Mother had major depression but that it was being adequately treated. Dr. Whitehead explained that persons with ADHD can be impulsive, noncooperative, and oppositional.

---

[1] Initially, the court reporter only filed transcripts containing the evidence presented at the October and December 2016 hearings. After Mother's brief was filed with this court but before DCS's brief was due, the trial court clerk filed with this court a supplemental transcript containing the hearing from August 22, 2016, at which two witnesses for the State testified. Because this transcript was not available when Mother prepared her brief, and because DCS does not refer to it in its brief, we will disregard the supplemental transcript.

He also said that Mother believed DCS was involved in some sort of conspiracy against her, although he did not necessarily think she was delusional in a mental illness sense. Furthermore, Dr. Whitehead did not think Mother was yet in the best possible psychiatric shape, and he wanted to try different treatments for her. He stated that Mother's ADHD would impact all areas of her life, and he did not know whether someone with her degree of ADHD and children could function well enough to avoid DCS involvement and whether it would make raising children more difficult.

[12] Mother also testified at the December hearing. Much of her testimony was in the form of long, rambling, hard-to-follow narratives. Before testifying, Mother said she had contracted MRSA from A.P. at their last visitation, though later she said she got it from an ex. She also discussed her first attempt to visit the children, said that immediately beforehand somebody slashed her tire with a knife, and then said she was given incorrect directions to the visitation site, which caused her to miss the visit. She generally accused various caseworkers and service providers of being corrupt or lying. She suggested that her blood sample after being arrested for OWI in June 2015 was tampered with by hospital employees. She accused a magistrate of throwing paperwork in her face. She admitted setting up websites to raise money for cancer treatment for both A.P. and T.P., although neither has cancer, out of purported fear they may develop cancer in the future. She stated that her case was "all a Title IV-D and a Medicaid fraud" and that it was a conspiracy similar to what is "going on all over the United States." *Id.* at 230.

On January 27, 2017, the trial court entered its order terminating Mother's parental rights to A.P. and T.P., accompanied by findings of fact and conclusions thereon. Mother now appeals.[2]

## Analysis

Mother contends there is insufficient evidence to support the termination of her parental rights. The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *In re I.A.*, 934 N.E.2d 1127, 1132 (Ind. 2010). "A parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" *Id.* (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054 (2000)). "Indeed the parent-child relationship is 'one of the most valued relationships in our culture.'" *Id.* (quoting *Neal v. DeKalb County Div. of Family & Children*, 796 N.E.2d 280, 285 (Ind. 2003)). We recognize that parental interests are not absolute and must be subordinated to the child's interests when determining the proper disposition of a petition to terminate

---

[2] Mother filed a sixteen-volume appendix with this court. DCS filed a motion to require Mother to file a conforming, much-smaller appendix, noting that the sixteen-volume appendix largely contains material outside the record and never presented during the termination hearings. In response, Mother contended the appendix contained the entire record as provided to her by the trial court clerk. It appears that if the trial court clerk did indeed indicate that all of the material in the sixteen-volume appendix was part of the termination record, it erroneously did so. Additionally, under Indiana Appellate Rule 50(A), an appellant is required to include in an appendix only relevant material from the record needed to decide the issues presented on appeal and certain other expressly-designated items, such as the CCS, rather than the entire record. We agree with DCS that Mother's appendix does not conform with Appellate Rule 50(A). However, because Mother did not cite any parts of the appendix in her brief that DCS claims was improper, and in the interest of expeditiously resolving this child case, we have by separate order elected to strike the improper parts of Mother's appendix rather than requiring her to file a conforming appendix.

parental rights. *Id.* Thus, "'[p]arental rights may be terminated when the parents are unable or unwilling to meet their parental responsibilities.'" *Id.* (quoting *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*). Courts need not wait until a child is irreversibly influenced by a deficient lifestyle such that his or her physical, mental, and social growth is permanently impaired before terminating the parent-child relationship. *Castro v. State Office of Family & Children*, 842 N.E.2d 367, 372 (Ind. Ct. App. 2006), *trans. denied*. "Rather, when the evidence shows that the emotional and physical development of a child in need of services is threatened, termination of the parent-child relationship is appropriate."[3] *Id.*

[15] When reviewing the termination of parental rights, we do not reweigh the evidence or judge witness credibility. *In re I.A.*, 934 N.E.2d at 1132. We consider only the evidence and reasonable inferences that are most favorable to the judgment. *Id.* We must also give "due regard" to the trial court's unique opportunity to judge the credibility of the witnesses. *Id.* (quoting Ind. Trial Rule 52(A)). Here, the trial court entered findings of fact and conclusions thereon in granting DCS's petition to terminate Mother's parental rights. When reviewing findings of fact and conclusions thereon entered in a case involving a termination of parental rights, we apply a two-tiered standard of review. First,

---

[3] Mother argues in part that DCS was required to prove that her having custody of the children was "wholly inadequate for their very survival," quoting *Matter of Meidl*, 425 N.E.2d 137, 141 (Ind. 1981). Our supreme court later disavowed this statement in *Meidl* as being inaccurate dicta. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We will set aside the trial court's judgment only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[16] Indiana Code Section 31-35-2-8(a) provides that, "if the court finds that the allegations in a petition described in [Indiana Code Section 31-35-2-4] are true, the court shall terminate the parent-child relationship." Indiana Code Section 31-35-2-4(b)(2) provides that a petition to terminate a parent-child relationship involving a child in need of services must allege, in part:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

DCS must establish these allegations by clear and convincing evidence. *Egly v. Blackford County Dep't of Pub. Welfare*, 592 N.E.2d 1232, 1234 (Ind. 1992).

[17] Mother does not direct us to any particular findings of the trial court that she believes are clearly erroneous. Rather, she more generally argues that DCS failed to prove the necessary elements of the termination statute by clear and convincing evidence. We disagree.

[18] We first address whether there is sufficient evidence of a reasonable probability that the conditions that resulted in the children's removal from Mother's care or the reasons for placement outside Mother's home will not be remedied.[4] When analyzing this issue, courts may consider not only the basis for the initial removal of the children, but also reasons for the continued placement of the children outside the home thereafter. *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Courts must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed circumstances. *A.D.S. v. Indiana Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The parent's habitual patterns of conduct should be evaluated to determine the probability of future neglect or deprivation of the child. *Id.* Factors to consider include a parent's

---

[4] Because Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, DCS needed to prove only one of the requirements of subsection (B). We conclude there is sufficient evidence of a reasonable probability that the conditions resulting in the children's removal from Mother's care would not be remedied, and we need not address whether there is sufficient evidence that continuation of the parent-child relationship posed a threat to A.P. and T.P.

prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *Id.* Courts also may consider services offered to the parent by DCS and the parent's responses to those services. *Id.* DCS is not required to prove a parent has no possibility of changing; it need only establish a reasonable probability that no change will occur. *Id.*

[19] The original reason for the children's removal from Mother's care was that she was hospitalized for mental health reasons. The condition of the home also was found to be inadequate for children due to the extreme amount of clutter, as well as an insect infestation. After the children's removal, it was discovered that they required therapy. Although there was not a precise diagnosis for T.P., because he was more guarded with the counselor, A.P. was diagnosed with anxiety and PTSD resulting from Mother's neglect. A.P. related erratic and out-of-control behavior by Mother, including fights between Mother and Springs and being awakened in the middle of the night when Mother wanted to find drugs.

[20] During the CHINS proceeding, Mother showed little or no willingness to cooperate with DCS caseworkers and other service providers. Instead, she believed they were engaged in some sort of conspiracy against her. Mother refused to acknowledge that there was anything wrong with her parenting. Additionally, the condition of the home had not improved at all by the time of the termination hearings. Supervised visitation was at first sporadic or non-existent and then was terminated after an episode in which Mother attempted

to convince the children to leave with their biological father and sister for Florida against their wishes, which greatly upset the children. Mother still was involved with Springs at the time of the last termination hearing, and her frequent conflicts with him were one of the issues that caused A.P. to develop PTSD; Springs also had a clear history of illegal drug use, both before and during the CHINS proceedings.

[21] With respect to Mother's mental health, Dr. Whitehead seemed to present a relatively more upbeat prognosis for Mother than Dr. Unfried. However, even Dr. Whitehead acknowledged the difficulties that Mother's severe ADHD presents in her life and that she still had a ways to go in successfully treating it. Dr. Whitehead also did not give any opinion about Mother's ability to parent in her current condition. Dr. Unfried did, however, and he was concerned about Mother's ability to control her behavior and care for children, given that she was unable to control her behavior within the structured environment of his office. Mother also was re-hospitalized in September 2015 and also was arrested for and pled guilty to OWI during the CHINS proceedings. Mother's tendency for unfocused and paranoid, untrusting thinking, with little or no regard for how her behavior and actions impacted the children, unfortunately was on display at the December 2016 termination hearing. The evidence in this case and the trial court's findings are adequate to support the conclusion that there is a reasonable probability the reasons for the children's initial removal from Mother's care and continued placement outside her home would not remedied.

[22] Next, we consider whether there is sufficient evidence that termination of Mother's parental rights was in the best interests of A.P. and T.P. In determining whether termination is in a child's best interests, courts should look beyond the factors identified by DCS and consider the totality of the evidence. *In re I.A.*, 903 N.E.2d 146, 155 (Ind. Ct. App. 2009). Recommendations of a DCS caseworker and child advocate to terminate parental rights, combined with evidence that the conditions resulting in removal will not be remedied, are sufficient to show by clear and convincing evidence that termination is in the child's best interests. *Id.*

[23] Here, the DCS caseworker and CASA both testified unequivocally that they believed termination was in the children's best interests. Their testimony was bolstered by evidence of the dramatic improvement in both children's emotional health, sociability, and educational achievement (especially with respect to T.P.) while they were in the care of the foster parents. By contrast, Mother's last interaction with the children, when she attempted to convince them to leave their foster parents and move to Florida, was deeply upsetting to the children, who wished to remain in the stable environment provided by the foster parents. The foster parents also want to adopt the children.

[24] Mother suggests that termination is premature and that she should be allowed to continue addressing her mental health issues and work toward eventual reunification with A.P. and T.P. However, a child's need for permanency and stability is a central consideration in determining a child's best interests. *In re E.M.*, 4 N.E.3d 636, 647-48 (Ind. 2014). "Simply stated, children cannot wait

indefinitely for their parents to work toward preservation or reunification—and courts 'need not wait until the child is irreversibly harmed such that the child's physical, mental and social development is permanently impaired before terminating the parent-child relationship.'" *Id.* at 648 (quoting *K.T.K. v. Indiana Dep't of Child Servs.*, 989 N.E.2d 1225, 1235 (Ind. 2013)). By the time of the final termination hearing in this case, the children had been apart from Mother for almost two years, during which time she showed little to no improvement in her ability to adequately care for the children—indeed, she appeared to show no indication that she needed or wanted to improve, instead choosing to blame her difficulties on allegedly corrupt DCS workers and service providers. The children need not wait any longer for stability and permanency in their lives. In sum, there is sufficient evidence that termination of Mother's parental rights was in the best interests of A.P. and T.P.

[25] Finally, we are cognizant that many of the issues in this case can be directly traced to Mother's mental health problems and that she was receiving psychiatric treatment throughout the CHINS proceedings and even before to attempt to address those problems. However, although a parent's mental health problems standing alone cannot support a termination of parental rights, neither do such problems prohibit termination. *See T.B. v. Indiana Dep't of Child Servs.*, 971 N.E.2d 104, 110 (Ind. Ct. App. 2012), *trans. denied*. A parent's mental illness may be considered in a termination case if the parent is unable or unwilling to fulfill his or her legal obligations in caring for his or her children. *Egly*, 592 N.E.2d at 1234. Even if there is some link between a parent's mental

illness and a failure to progress in services or to adequately care for his or her child, such illness or mental deficits do not excuse such failures or allow the parent to keep his or her children "regardless of the danger to their health and well-being." *In re A.S.*, 905 N.E.2d 47, 50 (Ind. Ct. App. 2009). Mother's mental illness or illnesses were not a barrier to the termination of her parental rights.[5]

## Conclusion

[26] There is sufficient evidence to support the termination of Mother's parental rights to A.P. and T.P. We affirm.

[27] Affirmed.

May, J., and Bradford, J., concur.

---

[5] Mother also briefly argues that DCS did not have an adequate plan for A.P. and T.P. following termination. However, this argument was dependent on her argument that termination is premature, which we already have rejected.